## 65565. GANN v. THE STATE.
## 65566. JACKSON v. THE STATE.

BIRDSONG, Judge.

Melvin Gann and Jimmy Lee Jackson were tried jointly for armed robbery, found guilty of the lesser offense of robbery, and each sentenced to serve 15 years, ten years incarcerated and five years probated.

The alleged victim of the robbery, 35-year-old Ronald Ivey, from Sparta, North Carolina, suffers from severe epilepsy which requires him to take several medications constantly; because of his illness, he has never held a job. When he drinks alcohol, he is subject to grand mal seizures during which his strength is greatly magnified and he is unaware of his movements.

The robbery took place on the night of Saturday, May 1, 1982. According to Ivey's testimony, he had gone to Chattanooga, Tennessee to visit his children, and was at the Chattanooga bus station waiting to return to North Carolina when two men, identified as the appellants, approached him. Ivey's statement is not clear as to whether the two men offered Ivey $10 to drive them to Birmingham, Alabama in their car, or whether they offered to drive Ivey to Birmingham for $10. At any rate, Ivey fell in with the pair and all three left the bus station to get gasoline. Ivey had a $50 bill; he bought $5 worth of gas for appellants' car. They went back to the bus station to pick up Ivey's suitcase, then "they [the appellants] insisted on stopping at this liquor store which they had kept on and on harping about." Ivey bought and paid for wine. All three were sitting in the front seat. Thereafter, the trio made two more rest room stops.

On the third stop, when they had reached Walker County, Georgia, the driver (the record is not clear whether this was Gann or Jackson) turned and "put his arm around me, he started stabbing me and told me to give me [sic] all my money and cigarettes. . . . They . . . told me they would kill me if I didn't give them the money . . . told me they would cut my face and cut my ears off, cut my nose off. . . ." Ivey testified the appellants used a knife to cut him on his forehead, back of his head, all over his face and lip. Then they pushed him out of the car. While Ivey was at the back of the car studying the license plate,

the appellants came behind the car and "asked me if I wanted to fight [or] get your face out of here, get out of my sight."

Thereafter, Ivey walked to a house and beat on the door and then collapsed. The sheriff's department received a call about 12:30 a. m. to go to this residence, and found "a white male laying face down on the porch. [He was] bleeding pretty bad from the back of his head and appeared to be unconscious." An investigator who saw Ivey later at the hospital said Ivey had several cuts on his jaw section, had several cuts and a large knot on the back of his head. Ivey spent some time recuperating at a "mission."

About 9:00 a. m. the next morning, at some distance from the residence (the record does not make clear how far), the sought-after vehicle was found wrecked off a bluff, with Gann beside it with cuts and abrasions and a broken leg. This is the basic story told by both defendants: that their drunken odyssey began in Nashville, Tennessee, at 7:30 a. m. the day of the alleged crime, and as the day progressed and as their trail meandered to Chattanooga, neither one remembered what happened, not even the wreck. Neither one remembered Ronald Ivey at all. They drank increasing amounts of cheap wine and liquor, and Jackson was also taking drugs for pain resulting from a fire in which he had severely burned his legs. He woke up beside the wrecked car and set off to get help for Gann.

There was some variation in the two versions; Jackson particularly had difficulty remembering the events when he was interviewed at 2:15 p. m. after being found passed out drunk behind a Tom Thumb store at 1:45 p. m., apparently having forgotten his mission to get help for Gann in his desire to drown his troubles again, this time with malt liquor purchased from the store. In the wrecked car were found Ivey's clothes, bags, papers, prescription bottles, and wallet. Jackson had 20 or 30 loose pills in his pocket; there was some debate as to what kind of pills these were, and whose, but Jackson said they were his own "Darvon" for his pain, which were broken out of their bottle in the wreck and had to be picked up off the ground. No knife was found.

The incident took place May 1. Gann and Jackson were indicted for armed robbery on May 4. Counsel was appointed for them on May 14. On May 18, defense counsel filed a Brady motion requesting Ivey's medical records because counsel had learned of Ivey's epilepsy and amnesia subsequent to the event, but was unable to verify these conditions. The motion was denied May 20. On May 24, the trial was set on the calendar for May 25 or 26. On May 25, the defense counsel presented several motions to the trial court including a motion to sever and a motion for continuance. Counsel advised the court they had just learned that immediately after the event and for several

days, Ivey had suffered total and partial amnesia, "and the doctor told [counsel] that the only thing that the victim remembers about this crime is what other people have told him about it"; counsel wanted time to get his medical records for discovery and impeachment purposes. The trial court denied the motions to sever and for continuance saying, "both defendants are confined in jail, they are entitled to a speedy trial, the alleged victim is present here, having traveled from the state of North Carolina, the case is on the calendar, it was called for trial yesterday, and it's going to be called today." Counsel was given an opportunity to interview Ivey before trial.

The trial proceeded the following morning. Near its end, the jury came out and asked the judge: "Dr. Robert Montague is listed here as a witness. We didn't receive anything to do with this other than the fact that [Ivey] was treated by him [after the incident], and we would like to know if he did, indeed, say the wounds were knife wounds. . . . If they were listed as knife wounds, if it could have been the result of a fall, we don't have this information." To this the court replied, "Madam Foreman, the Court will explain to you that that witness did not testify in this case, and his evidence is not before you.

"Now, the Court will explain that the fact that a witness is listed on the back of an indictment doesn't mean that that witness should appear in court. Quite often witnesses are listed, *and for some reason,* a party desires, that is *the District Attorney's Office desires, or determines that there's no need to call that witness, so that witness does not appear.* (Emphasis supplied.)

"Now, the Court will explain to you, you will not be prejudiced against the State, you will not be prejudiced against the defendants, either one of them, and you'll not be biased in favor of the State, you'll not be biased in favor of either defendant because of the absence of that witness, but you'll remain fair and impartial jurors, and you'll decide this case and reach a verdict on the evidence as presented on the trial of the case, and under the instruction of the law given you by the Court."

Defense counsel immediately but unsuccessfully requested a recharge on the state's burden of proof, contending that the statement to the effect that sometimes the state has not called a witness because the district attorney does not feel it necessary, might in effect have implied the state has already sustained the burden of proof and does not "need" any more proof. Shortly after, the jury returned a guilty verdict, but reduced the conviction from armed robbery to robbery. *Held:*

1. The trial court did not err in failing to grant a continuance to the defendants in the case.

The grant or denial of a continuance to a criminal defendant is in the "*sound* discretion of the court," especially when the defendant is in jail. (Emphasis supplied.) OCGA §§ 17-8-1; 17-8-22 (Code Ann. §§ 27-1301; 81-1419). OCGA § 17-8-33 (Code Ann. § 27-2002) mandates that a criminal case shall be tried at the same term in which indictment is found unless "the principles of justice should require a continuance . . ." The constitutional right to speedy trial belongs to the defendant; the trial court has broad discretion in protecting that right. We do not find the trial court's discretion was unsound in this case, particularly since defense counsel at trial, by questioning the victim, thoroughly explored the fact that Ivey was epileptic and subject to seizure and amnesia, which was the ultimate fact appellants sought to prove by obtaining a continuance to obtain Ivey's medical records.

Furthermore, the appellants filed Brady motions on May 17, 1982, and an amended Brady motion on May 18, 1982, requesting complete medical records from North Carolina relating to the victim. The state had no medical records requested by the appellants on May 18, 1982. The appellants then had eight days in which to obtain the records requested of the state; however, apparently the appellants made no effort to secure the records before the day of trial.

The state is not required to actively seek the materials requested by the appellants when the materials are not in possession of the state. *Hines v. State,* 249 Ga. 257 (290 SE2d 911); *Hicks v. State,* 232 Ga. 393 (207 SE2d 30).

2. Likewise, the trial court did not commit reversible error in failing to recharge the jury on the state's burden of proof or correct his statement that the state sometimes does not call witnesses if it feels it does not "need" to do so. The trial judge fully charged the jury that the absence of a witness was not to be held against or in favor of either party, and presented no basis for bias against either. In view of this full instruction, the early misstatement, if it was error, was rendered harmless.

3. Based on what is in this record, the trial court did not err in refusing a severance, since both defendants ultimately testified to the same thing: that they remembered nothing. No clear showing of prejudice and denial of due process arises in this record. *Cain v. State,* 235 Ga. 128, 129 (218 SE2d 856).

The trial court's charge on criminal intent and negligence, though ill-phrased, was not incorrect or misleading, and not prejudicial.

4. The trial court did not err in denying appellants' Brady motion, which sought to have the state obtain medical records of the victim. It is well-settled that the state has no obligation to search for

or obtain information for the defendant. *Hines v. State,* supra; *Hicks v. State,* supra. Brady motions go to the production of exculpatory evidence in possession of the state. *Hicks,* supra. The evidence sought by the appellants was not a proper subject of a Brady motion.

*Judgment affirmed. Shulman, C. J., and McMurray, P. J., concur.*

DECIDED APRIL 4, 1983.

*Joseph E. Willard, Jr.,* for appellant (case no. 65565).
*William P. Slack,* for appellant (case no. 65566).
*David L. Lomenick, Jr., District Attorney, Herbert E. Franklin, Jr., Virginia R. B. Harmon, Assistant District Attorneys,* for appellee.